**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

RALPH INZUNZA,
            *Defendant-Appellant.*

No. 05-50902

D.C. No.
CR-03-02434-JTM

UNITED STATES OF AMERICA,
            *Plaintiff-Appellant,*

v.

MICHAEL ZUCCHET,
            *Defendant-Appellee.*

No. 05-50960

D.C. No.
CR-03-02434-JTM

OPINION

Appeal from the United States District Court
for the Southern District of California
Jeffrey T. Miller, District Judge, Presiding

Argued June 3, 2008
Submitted August 26, 2009
Pasadena, California

Filed September 1, 2009

Before: William C. Canby, Jr., Jay S. Bybee and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Canby

12141

## COUNSEL

Demetra Lambros, Attorney, United States Department of Justice, Washington, D.C., for the plaintiff-appellee/appellant.

Benjamin L. Coleman, Coleman & Balogh, LLP, San Diego, California, for the defendant-appellant.

Dennis P. Riordan, Riordan & Horgan, San Francisco, California, for the defendant-appellee.

## OPINION

CANBY, Circuit Judge:

Ralph Inzunza and Michael Zucchet, former members of the San Diego City Council, were indicted on numerous counts of honest services fraud, conspiracy to commit honest services fraud, and extortion. Both cases went to trial, and both defendants were convicted on various counts. The district court rejected Inzunza's motion for acquittal and a new trial. It granted Zucchet's motion for acquittal on several counts and his motion for a new trial on the remaining two. Inzunza has appealed his convictions, and the government has appealed the district court's rulings on Zucchet's motions. We affirm the holdings of the district court with respect to both

Inzunza and Zucchet. We stay our mandate, however, to await the decision of the Supreme Court in *United States v. Weyhrauch*, 548 F.3d 1237 (9th Cir. 2009), *cert. granted*, 2009 WL 789239 (U.S. June 29, 2009).

## FACTUAL BACKGROUND

In 2000, the San Diego City Council enacted an ordinance banning touching between exotic dancers and patrons: the so-called No-Touch ordinance. This ordinance replaced another provision banning only "lewd and lascivious" conduct at clubs. The bright line aspect of the No-Touch ordinance made for easier law enforcement and eliminated the need to spend public funds on lap dances for undercover police officers. It also put a damper on strip club profits.

Michael Galardi owned several strip clubs in Las Vegas and the all-nude "Cheetahs" club in San Diego. Unhappy with his business prospects under the No-Touch ordinance, he sought ways to get rid of it. He obtained the help of his friend Lance Malone, a former Las Vegas county commissioner, to work toward the ordinance's repeal.

In May 2001, Malone began his mission. He and another Galardi employee, John D'Intino, went to a fundraising event and met with Inzunza, giving him campaign contribution checks from Cheetahs associates totaling $1,750. Inzunza was a city councilman at the time, and he listened to their ideas. He indicated that the chances of getting the law repealed were not great, but that there was a way to change those odds. If a police officer were to come to the City Council and state that the ordinance was counterproductive, that "[t]his law was a bad idea" that "[i]t's not working . . . too much paperwork," then Inzunza would have an excuse to bring it before the Public Safety and Neighborhood Services Committee, which oversees the city's adult entertainment industry.

A month later, Malone and Inzunza had lunch. Malone delivered to Inzunza $8,650 in checks traceable to Galardi.

Inzunza was evidently impressed with the amount of money he received. Malone later told D'Intino that Inzunza had said, in reference to the No-Touch ordinance, "I'll make sure that we get that on [the] docket." Inzunza also told Malone that they would be able to repeal the law only with the help of other Council members and, in particular, Zucchet, who was running for a seat on the Council. According to Malone, Inzunza said, "We get him in, you support him, we'll get it off."

In July 2001, Inzunza called Malone and told him that they would have a private meeting with Zucchet at an upcoming fundraiser. Malone met privately with Zucchet for half an hour at the event and gave him $6,750 in checks, more than half the total raised for Zucchet at the fundraiser. Once Zucchet realized that the checks were traceable to adult entertainment, however, he decided that they were too much of a political liability and returned the money. He and Malone left open the possibility of future contributions.

The possibility became a reality early in 2002, when Inzunza called Malone and asked him to bring a few thousand dollars for Zucchet to an upcoming luncheon. Inzunza insisted that this time, the money not be traceable to the adult entertainment industry. Malone contacted Tony Montagna, a Galardi employee who ran a gym in San Diego (and who happened to be an FBI informant) to have his clients write $2,000 in checks. D'Intino delivered the checks to Inzunza for Zucchet at a fundraiser on February 28, 2002. During the election run-off that year, Malone delivered another $3,000 in checks to Zucchet. Zucchet won the November 2002 run-off.

Because Inzunza had already won his election outright, Inzunza and Malone had begun to strategize about repealing the No-Touch ordinance earlier that year, in March. Inzunza stated that he would put together a legislative proposal that appeared to tighten the overall restrictions on strip clubs but eliminated the No-Touch ordinance at the same time. Inzunza

also asked if Malone knew any police officers; they would need a cop to provide cover for the plan, so that it appeared that the police were behind the legislative push. Malone contacted Detective Russ Bristol, a San Diego police officer (also an FBI informant) with whom he already had an ostensibly corrupt relationship, and scripted a phone call to take place between Detective Bristol and Inzunza. Inzunza was motivated to keep the plan secret, stating, "[I]f this gets out to the media, I'm gonna tell 'em I wanted to make the ordinance tougher." Before the call took place, Inzunza decided to have e-mails sent to all the council members about adult entertainment issues, giving Inzunza a pretext for his interest in the No-Touch ordinance. Malone obliged, having two such e-mails sent from imaginary citizens to the Council. Inzunza then contacted Detective Bristol, telling him that concerned citizens had raised questions about adult entertainment and were asking for legislative suggestions. During this time period, Malone repeatedly expressed confidence that Inzunza was willing to take action on his behalf.

With the November election out of the way, Zucchet was assigned to the Public Safety and Neighborhood Services Committee (hereinafter "the Committee"). On February 10, 2003, Zucchet, Inzunza, and Malone met for lunch and discussed the repeal of the No-Touch ordinance. Zucchet indicated some confusion about Malone's legislative objectives; he had assumed, on the basis of a "twenty-second preview" from Inzunza, that Malone wanted to legalize topless lap dances instead of clothed lap dances. Malone and Inzunza clarified their objectives and proposed various forms of cover to distract public attention from the repeal of the No-Touch ordinance, such as increasing the required distance between adult businesses or banning all-nude clubs. Zucchet doubted that they could obtain the support of the police, and said he was not "too optimistic" about repealing the No-Touch ordinance. Malone reported back to Galardi that both Zucchet and Inzunza were on board.

Things did not go as smoothly as Malone had hoped. Concerns lingered over Zucchet's commitment and, on February 28, 2003, Malone told Galardi that he would follow up with Inzunza to ensure that Zucchet would "come through" for them. When Malone tried to arrange a meeting between Zucchet and Detective Bristol, Zucchet instead set up a meeting with the head of the vice unit, Lt. Kanaski. According to statements by Malone, Zucchet insisted on keeping the appointment, and Malone urged him not to mention the No-Touch ordinance or Detective Bristol. Malone conferred with Inzunza about this mishap, asking Inzunza to follow up with Zucchet, and stating, "I'm there for you anything you ever need . . . I mean there's never a question."

When Zucchet met with Lt. Kanaski, he started off by talking about distance requirements between adult establishments. Lt. Kanaski turned the conversation to the No-Touch ordinance and made it clear that the police did *not* oppose it. Malone found out that the conversation had gone awry and became concerned about his relationship with Inzunza and Zucchet. Inzunza's staff assured him that they were still working on repeal of the ordinance. Galardi testified that in March 2003, he gave Malone $6,000 in cash to divide among Inzunza, Zucchet, and one other now-deceased councilman, Charles Lewis.

On the advice of one of Lewis's staffers, Malone formulated a new plan. A "concerned citizen" would appear before the Committee and ask it to tighten the distance requirements between adult businesses. Once the matter was referred to the Committee and voted on, Detective Bristol would come in to criticize the No-Touch ordinance and Inzunza would amend the distance provision to repeal it. Malone and Zucchet had breakfast on April 16, 2003, and Zucchet stated that he would "do the lifting at the committee level." Zucchet confirmed the plan with Inzunza. Galardi testified that the night before the breakfast, he gave Malone another $10,000 in cash to give the councilmen.

On April 30, 2003, the "concerned citizen" plan was executed, and Zucchet referred the matter for a report by the city attorney, which amounted to a referral to the Committee. Inzunza now decided that he would put the No-Touch ordinance before the Committee in addition to the distance provision. His staff worked on a memo with Malone, and Inzunza consulted the Committee chair about repealing the No-Touch ordinance. In May, 2003, Zucchet learned from the city attorney that the current distance restrictions on adult businesses could not be expanded, so he indicated that there was no need for a report to the Committee. On May 14, 2003, repeal plans ended when the government executed a series of search warrants, raiding City Hall.

The defendants were subsequently indicted on numerous counts of honest services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346, one count of conspiracy to commit honest services wire fraud in violation of 18 U.S.C. § 371, and three counts of extortion in violation of the Hobbs Act, 18 U.S.C. §§ 1951-1952. The case was tried over a period of eleven weeks, and the jury returned a verdict. Inzunza was found guilty on the conspiracy count, on several of the honest services fraud counts, and on the Hobbs Act counts. Zucchet was found guilty on the conspiracy count, on a different set of honest services counts, and on the Hobbs Act counts.[1] Both defendants moved for judgments of acquittal and, alternatively, new trials. The district court denied Inzunza's motion and sentenced him to 21 months' imprisonment. The court granted Zucchet's motion for a judgment of acquittal on the Hobbs Act and four honest services counts; on the remaining counts — one honest services count and the conspiracy count — the court denied Zucchet's motion for acquittal but granted a new trial. Inzunza appeals his conviction; the government appeals the grant of Zucchet's motions.

---

[1]Because Zucchet was not elected until November 2002 and the alleged Hobbs Act violations took place prior to that date, he seems to have been convicted as an aider and abettor on those counts.

## DISCUSSION

Out of this extensive record, created through years of investigation and months of trial, the parties challenge the district court's rulings on a multitude of grounds. Although the charges against both defendants arise out of a common narrative, and the cases were consolidated for appeal, the defendants were not convicted on the same set of charges. Moreover, Inzunza is the appellant in his appeal, while Zucchet is the appellee in his. Therefore, we address each appeal separately.

### Defendant Inzunza

### A.   Sufficiency of the Evidence

The standard of review for determining the sufficiency of the evidence "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). We review de novo the denial of a motion for acquittal. *United States v. Tucker*, 133 F.3d 1208, 1214 (9th Cir. 1998). We review for an abuse of discretion the district court's ruling on a defendant's motion for a new trial. *See United States v. Mack*, 362 F.3d 597, 600 (9th Cir. 2004).

[1] Under the Hobbs Act, political campaign contributions rise to the level of extortion if they are "made in return for an explicit promise or undertaking by the official to perform or not to perform an official act"—that is, a *quid pro quo*. *McCormick v. United States*, 500 U.S. 257, 273 (1991). Similarly, when the government seeks to prove honest services fraud in the form of bribery, it must prove a *quid pro quo*. *United States v. Kincaid-Chauncey*, 556 F.3d 923, 943 (9th Cir. 2009).

**[2]** Our court has elaborated on the type of evidence that will sustain a finding of *quid pro quo*:

> [W]hat *McCormick* requires is that the *quid pro quo* be clear and unambiguous, leaving no uncertainty about the terms of the bargain . . . . [T]he explicitness requirement serves to distinguish between contributions that are given or received with the "anticipation" of official action and contributions that are given or received in exchange for a "promise" of official action. When a contributor and an official clearly understand the terms of a bargain to exchange official action for money, they have moved beyond "anticipation" and into an arrangement that the Hobbs Act forbids. This understanding need not be verbally explicit. The jury may consider both direct and circumstantial evidence, including the context in which a conversation took place, to determine if there was a meeting of the minds on a *quid pro quo*.

*United States v. Carpenter*, 961 F.2d 824, 827 (9th Cir. 1992) (internal citation omitted).

**[3]** We confess considerable uneasiness in applying this standard to the acceptance of campaign contributions because, in our flawed but nearly universal system of private campaign financing, large contributions are commonly given in expectation of favorable official action. The Supreme Court was sensitive to this issue in *McCormick*:

> Money is constantly being solicited on behalf of candidates, who run on platforms and who claim support on the basis of their views and what they intend to do or have done. Whatever ethical considerations and appearances may indicate, to hold that legislators commit the crime of federal extortion when they act for the benefit of constituents or support legisla-

tion furthering the interests of some of their constitu-
ents, shortly before or after campaign contributions
are solicited and received from those beneficiaries, is
an unrealistic assessment of what Congress could
have meant by making it a crime to obtain property
from another, with his consent, "under color of offi-
cial right."

*McCormick*, 500 U.S. at 272. How, then, in the potentially
polluted atmosphere of campaign contributions, can we tell a
criminal agreement from a large campaign contribution
accepted from a contributor who expects favorable results?
The Supreme Court's answer lies in the level of explicitness,
which permits a line to be drawn legally if not according to
ethical perfection.

> The receipt of [campaign] contributions is . . . vul-
> nerable under the Act as having been taken under
> color of official right, but only if the payments are
> made in return for an explicit promise or undertaking
> by the official to perform or not perform an official
> act. In such situations the official asserts that his
> official conduct will be controlled by the terms of
> the promise or undertaking.

*Id.* at 273. We note that this requirement of explicitness refers
to the promise of official action, not the connection between
the contribution and the promise. An official may be con-
victed without evidence equivalent to a statement such as:
"Thank you for the $10,000 campaign contribution. *In return
for it*, I promise to introduce your bill tomorrow." The con-
nection between the explicit promise of official action and the
contribution must be proved, but the proof may be circum-
stantial, under the test as it is stated in *McCormick* and elabo-
rated in *Carpenter*, 961 F.2d at 827.

[4] So stated, the test may still leave grey areas where the
connection between contribution and promise is sufficiently

attenuated that permitting a jury to speculate on the requisite connection between contribution and promise would stretch the Act beyond its intended application. Candidates campaigning for office, at a time when contributions are being solicited and received, may assert quite explicitly an intention to take certain official actions, yet few would conclude that Congress intend to make such conduct, without more, a crime. Our review of the record in this case, however, leads us to conclude that Inzunza's conviction raises no such concerns. The jury could properly find that Inzunza's conduct met the *quid pro quo* requirement. There was no absence of very explicit promises, made directly to the person delivering the contributions, regarding actions Inzunza would take toward repealing the No-Touch ordinance. The circumstances of the promises, including their covert nature, their detail, and the deception in carrying them out, were such that the jury could connect them causally to campaign contributions privately made at or near the same time.

[5] Inzunza contends that, because so much evidence of his conduct came from second- and third-hand accounts of his statements and actions, admitted either as admissions of a party opponent or statements in furtherance of the conspiracy, the evidence was insufficient. It is true that statements by co-conspirators do not support a conviction and are not admissible unless they are corroborated by other evidence of the conspiracy and the defendant's involvement. *United States v. Silverman*, 861 F.2d 571, 577 (9th Cir. 1988). Inzunza does not contend that this evidence was improperly admitted, but he claims that the district court "almost exclusively relied on alleged co-conspirator statements to sustain the convictions." Because the statements are so unreliable, he argues, the convictions cannot be sustained. His characterization of the record is not accurate, however. In addition to statements of co-conspirators regarding Inzunza's involvement, the jury also heard several other items of evidence, including several recordings of Inzunza's own voice as described in the following paragraph.

On January 15, 2002, Inzunza and Malone discussed the need to provide Zucchet with additional funds, and Malone assured him that "it would be very, very, ah, discreet this time." On February 7, 2002, Inzunza asked Malone for a few thousand dollars more to support Zucchet's campaign. Malone told him "I may need a favor," and Inzunza replied, "Right right. Well, just let me know what's going on." On May 13, 2002, Malone and Inzunza discussed their plan to use Detective Bristol, and Inzunza stated, "[W]e'll throw in four or five things that sort of slaps you guys on the hand, and then we'll allow touching." He also said that if news of the plan to repeal the No-Touch ordinance got out to the media, he would tell them he wanted to toughen the ordinance. On October 14, 2002, Inzunza and Malone discussed the emails that were sent to Detective Bristol, and Inzunza requested an additional $3,000. On February 10, 2003, Malone, Inzunza, and Zucchet had an extensive discussion of the No-Touch ordinance and strategies to get it repealed. Malone stated, "If you guys need anything, whatever, whatever you need we're here and happy to help." On March 20, 2003, Malone and Inzunza discussed the fact that Zucchet had set up a meeting with the wrong police officer, who was not in on the plan. Malone asked Inzunza to tell Zucchet not to mention the No-Touch ordinance.

In denying Inzunza's motion for acquittal, the district court noted that Malone passed several checks to Inzunza and (at Inzunza's urging) Zucchet. It also noted that Inzunza took official action, as he said he would, to achieve the repeal of the No-Touch ordinance by contacting Detective Bristol, scheming to fabricate emails seeking increased restrictions on adult entertainment, instructing staff to compose memoranda, and lobbying the Committee chair to support the repeal of the No-Touch ordinance.

[6] This independent corroborating evidence permitted the jury to credit the statements of the co-conspirators quoting Inzunza ("I'll make sure we get that on [the] docket"; "You

support [Zucchet], we'll get it off" or referring to him as a co-conspirator ("Don't worry about Ralph. Ralph is with me."; "These guys are willing to bend over backward for us."). Therefore, the district judge did not err by basing his conclusion partly on the statements of co-conspirators.

Inzunza also argues that considering each charge separately, the evidence "temporally relevant" to each charge is insufficient. Thus, D'Intino's 2001 quotation of Inzunza, "[Y]ou support [Zucchet], we'll get it off," was insufficient to support a finding that the July 12, 2001, phone conversation between Inzunza and Malone involved a *quid pro quo*. Without that piece of evidence, Inzunza argues, there is nothing to show that Inzunza had any knowledge of the No-Touch ordinance until 2002. With the other corroboration discussed above, however, a juror could credit this statement of a co-conspirator.

Inzunza next contends that the receipt of campaign contributions on February 28, 2002, was not shown to pertain to any particular official act, and therefore, it could not suffice to show a *quid pro quo*, citing *United States v. Chong*, 419 F.3d 1076, 1082-83 (9th Cir. 2005), a murder-for-hire case where the payment was not shown to be in return for the murder. Conversely, Inzunza concedes that he had knowledge of the desired official act during phone calls on May 13 and July 31, 2002, but at that point no money was changing hands. It is true that the "favor" mentioned in the February 7 phone call was not specified in that phone call, but a rational juror could fairly conclude beyond a reasonable doubt that throughout the Malone-Inzunza relationship, reciprocity was understood and often stated. *See Kincaid-Chauncey*, 556 F.3d at 943 (holding that *quid pro quo* need not be tied to a specific official act, so long as evidence shows a pattern of gifts in exchange for official actions). For similar reasons, the actions discussed in the May 13 and July 31 phone calls could be understood to pertain to contributions made at other times. Inzunza attempts to divorce the phone calls from the payments, but circumstantial

evidence of a *quid pro quo* related to Inzunza's explicit promises of official action can serve to sustain the verdict. *See id.*; *United States v. Ganim*, 510 F.3d 134, 148-49 (2d Cir. 2007).

With respect to the alleged $3,000 bribe discussed on October 14, 2002, Inzunza contends that certain conversations undermine proof of his specific intent. Particularly, he cites his lack of a promise and Zucchet's February 10, 2003, statement (made in Inzunza's presence) that he was "not promising anything" and that Malone should not be "too optimistic" about repealing the No-Touch ordinance. Taken in context, these statements do not undermine Inzunza's overarching promise to take several official actions aimed at repeal of the ordinance; Zucchet's statement merely disclaims any guaranteed legislative result. And as before, the scheme to stage a police request for legislative changes and the overall pattern of campaign contributions with reference to the No-Touch ordinance supports the jury's finding that these telephone calls and those occurring on February 12, February 24, and March 20, 2003, involved a *quid pro quo* relationship between Inzunza's promised actions and the contributions.

Finally, Inzunza contends that the jury rejected Galardi's testimony about cash payments in March and April 2003 and therefore this evidence could not support his honest services conspiracy conviction. As explained above, there was sufficient evidence from which a rational jury could find that Inzunza conspired to commit honest services fraud without any reference to these last payments.[2]

---

[2]Inzunza also contends that the outcome was prejudiced by evidence of a conspiracy involving Detective Bristol and Galardi, where Detective Bristol accepted bribes in exchange for giving advance notice of vice inspections of the strip clubs. "Whether the evidence is easily compartmentalized is of foremost importance" in determining whether evidentiary spillover was prejudicial; "[e]vidence is susceptible of compartmentalization when the acts constituting the crimes . . . are discrete." *United States v. Duran*, 189 F.3d 1071, 1081-82 (9th Cir. 1999) (internal quotation

**[7]** For these reasons, Inzunza's claim of insufficient evidence has no merit, and the district court properly denied his motion for a judgment of acquittal and his motion for a new trial.

## B.    The Sufficiency of the Indictment

Inzunza challenges the sufficiency of the honest services fraud indictment. He also argues that the jury instructions were similarly deficient and that the honest services fraud statute is unconstitutionally vague on its face. We review all of these claims de novo. *United States v. Alber*, 56 F.3d 1106, 1111 (9th Cir. 1995) (sufficiency of the indictment); *United States v. Stapleton*, 293 F.3d 1111, 1114 (9th Cir. 2002) (sufficiency of jury instructions); *United States v. Rodriguez*, 360 F.3d 949, 953 (9th Cir. 2004) (vagueness). A defective indictment is a structural flaw not subject to harmless error review. *See United States v. Omer*, 395 F.3d 1087, 1088 (9th Cir. 2005).

Inzunza argues that his indictment was defective because it failed to allege, as implied elements of honest services wire fraud, private gain on his part, a violation of state law, and materiality. The district court rejected the first two of these arguments; the third is raised for the first time in this appeal. "The elements of mail and wire fraud are: (1) proof of a scheme to defraud; (2) using the mails or wires to further the fraudulent scheme; and (3) specific intent to defraud." *United States v. Sullivan*, 522 F.3d 967, 974 (9th Cir. 2008) (citing 18 U.S.C. §§ 1341, 1343). "Implied, necessary elements [of the offense], not present in the statutory language, must be

marks and citation omitted). The district court instructed the jury that evidence of the advance-notice scheme could not be considered against the councilmen, and it is relatively easy to compartmentalize that scheme from the steps taken to repeal the No-Touch ordinance. Therefore, no prejudicial spillover occurred.

included in an indictment." *United States v. Du Bo*, 186 F.3d 1177, 1179 (9th Cir. 1999) (original alteration and citation omitted). If the grand jury fails to find all the elements, the indictment must be dismissed. *Id.* at 1179-81. We reject Inzunza's contentions and hold that the indictment was sufficient.

### 1. Private Gain

**[8]** A split of authority exists as to whether an honest services indictment must allege a personal or private gain element of the offense. Taking the minority view, the Seventh Circuit has answered yes, *see United States v. Bloom*, 149 F.3d 649, 655-57 (7th Cir. 1998), and it reaffirmed the rule very recently, *United States v. Sorich*, 523 F.3d 702, 708-11 (7th Cir. 2008); *United States v. Thompson*, 484 F.3d 877, 882-84 (7th Cir. 2007).[3] Other circuits reject the private gain requirement, either because they adopt a state-law-violation requirement instead, *see United States v. Brumley*, 116 F.3d 728, 735 (5th Cir. 1997), or because they see private gain as unnecessary in light of the statute's intent requirement, *see United States v. Welch*, 327 F.3d 1081, 1106-07 (10th Cir. 2003). We agree with the latter view.

The Seventh Circuit justifies its private gain requirement with the history of § 1346 and practical necessity. Prior to 1988, the text of the wire fraud statute prohibited any "scheme or artifice to defraud" but made no mention of "honest services." *See* 18 U.S.C. § 1343. While lower federal courts understood this provision to reach deprivations of honest services, the Supreme Court overruled that understanding

---

[3]One Seventh Circuit decision issued after *Bloom* but before *Thompson* holds that "an intent to defraud does not turn on personal gain." *United States v. Stockheimer*, 157 F.3d 1082, 1087 (7th Cir. 1998). *Stockheimer* makes no mention of *Bloom*, and we do not take it to bear on the present issue because it involved ordinary mail fraud, not honest services mail fraud. *See Stockheimer*, 157 F.3d at 1084-87.

with its decision in *McNally v. United States*, 483 U.S. 350, 359-60 (1987), holding that "honest services fraud" lay outside the ambit of the statute.

Congress responded promptly by enacting § 1346, which defines the prohibited "scheme or artifice to defraud" as including "a scheme or artifice to deprive another of the intangible right of honest services." *Bloom*, 149 F.3d at 655. In *Bloom*, the Seventh Circuit required private gain out of concern that if the scope of honest services fraud was not so cabined, "then *every* breach of fiduciary duty [involving the mails or telephone] would be a crime." *Id.* at 656. "[E]very city employee would be required to shop exclusively in Chicago in order to maximize its receipts from sales taxes, and would be guilty of a federal felony if he bought a pair of boots through the mail from L.L. Bean." *Id.* at 654.

Other courts have criticized this reasoning. Undeterred by the "parade of horribles," the Third Circuit has rejected the "private gain" element as merely "substituting one ambiguous standard for another." *United States v. Panarella*, 277 F.3d 678, 692, 699 (3d Cir. 2002). The Tenth Circuit levels additional criticisms, declining "to judicially legislate by adding an element to honest services fraud which the text and the structure of the fraud statutes do not justify." *Welch*, 327 F.3d at 1107. It also rejects *Bloom*'s rationale: "The right to honest services is not violated by every breach of contract, breach of duty, conflict of interest, or misstatement made in the course of dealing." *Id*. Rather, the analysis must rest heavily on the intent requirement that is fundamental to any fraud prosecution: "Like proof of harm, proof of potential, actual, or contemplated gain is simply one means of establishing the necessary intent to defraud." *Id.* at 1106.

While we have not squarely addressed whether § 1346 requires private gain, we have recently addressed "the need to find limiting principles to cabin the broad scope of § 1346. *Kincaid-Chauncey*, 556 F.3d at 940 & n.13 (internal quotation

marks and citation omitted). In *Kincaid-Chauncey*, we declined the defendant's invitation to read a *quid pro quo* requirement into honest services generally to serve as such a limiting principle. *Id.* at 943. In so doing, we noted that the specific intent requirement for honest services fraud, which survives *McNally* by virtue of § 1346, limits § 1346 by distinguishing honest services fraud from legal conduct. *Id.* at 941. Quoting the Tenth Circuit, we also stated that " 'the intent to defraud does not depend on the intent to gain, but rather the intent to deprive.' " *Id.* (quoting *Welch*, 327 F.3d at 1106).

**[9]** We hereby adopt the majority rule that private gain is not an element of honest services fraud. We agree with the Tenth Circuit's conclusion that careful attention to the intent element dispels concerns about the statute's overbreadth. Evidence of private gain may bolster a showing of deceptive intent, but such a showing could also rest heavily on evidence of harm and deceit.

**[10]** The Tenth Circuit's tempered use of the private gain aspect—as a potentially sufficient but not necessary condition of honest services fraud—shows its worth in cases of egregious fraud where gain does not run to the perpetrator. A court requiring the prosecution to show private gain in such an instance might be forced to stretch that requirement beyond recognition. Indeed, the Seventh Circuit has opined that the prosecution could satisfy the "private gain" element by proving that the gain ran to an unrelated third party, even a charity. *Sorich*, 523 F.3d at 709-10 ("Robin Hood may be a noble criminal, but he is still a criminal."). Are charitable donations "private gain" in the sense that they gratify the spirit of the criminal? Rather than reckon with such imponderables, we join the majority of circuits in holding that private gain is not an "implied" or "necessary" element of honest services fraud, *Du Bo*, 186 F.3d at 1179. Neither the indictment nor the jury instructions need mention it.

*2.    State Law Violation*

**[11]** We also reject Inzunza's contention that a state law violation must be alleged and proved in cases of honest services fraud. Recently, in *United States v. Weyhrauch*, 548 F.3d 1237 (9th Cir. 2008), *cert. granted*, 2009 WL 789239 (U.S. June 29, 2009), we joined a majority of circuits in holding that the government is not required to prove an independent violation of state law to sustain an honest services fraud conviction. Thus, under our circuit's controlling law it was not necessary for the indictment to allege a state law violation, nor was it necessary to instruct the jury on this element. Because the Supreme Court has granted certiorari in *Weyhrauch*, however, we will stay our mandate in Inzunza's and Zucchet's cases to await the decision of the Supreme Court.

*3.    Materiality*

**[12]** Inzunza argues for the first time on appeal that materiality constitutes another element of honest services fraud that was omitted from the indictment and jury instructions. Because this challenge was not made at an early opportunity, the indictment is "liberally construed in favor of validity." *United States v. James*, 980 F.2d 1314, 1316 (9th Cir. 1992) (internal quotation marks and citation omitted). We need not decide whether a failure to dismiss the indictment on this basis amounts to error in an honest services fraud case, *see Omer*, 395 F.3d at 1088 (requiring an allegation of materiality in bank fraud cases), because the indictment in this case did allege that the culpable acts in question were material. Therefore, dismissal of the indictment on this ground was not warranted. Any failure to instruct the jury on materiality did not rise to the level of plain error "seriously affect[ing] the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 736 (1993) (internal quotation marks and citation omitted). The jury found that Inzunza with "an intent to deceive and cheat" entered into an agreement to repeal the No-Touch ordinance in return for

campaign contributions. The absence of a specific instruction on materiality caused no injustice.

### 4.    Facial Challenge to Vagueness

**[13]** In his last challenge to the honest services charges, Inzunza asserts that § 1346 is vague and therefore unconstitutional on its face. A statute is unconstitutionally vague if the challenger can "establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).[4] Both parties acknowledge that this court has upheld the statute against as-applied challenges based on vagueness. *See United States v. Williams*, 441 F.3d 716, 724-25 (9th Cir. 2006); *United States v. Frega*, 179 F.3d 793, 803 (9th Cir. 1999). Because the statute was valid in those applications, Inzunza cannot meet the *Salerno* standard, and his facial challenge fails.

## C.    Failure to Allege a *Quid Pro Quo*

Inzunza challenges the sufficiency of the Superseding Indictment on the Hobbs Act and honest services fraud charges for failure to allege a *quid pro quo*. Under our recent decision in *Kincaid-Chauncey*, this allegation was required as a matter of law. 556 F.3d at 937.

**[14]** Both the honest services and, by incorporation, the Hobbs Act charges state that Inzunza was part of a scheme in which money was paid to Inzunza "in order to corruptly influence him" and "in order to gain [his] support for measures . . . to advance the repeal of the No-Touch ordinance provision," and in which Inzunza would "accept money . . . and would agree to be corruptly influenced . . . to advance the repeal of

---

[4]Our court adheres to this standard, notwithstanding the plurality opinion in *City of Chicago v. Morales*, 527 U.S. 41 (1999). *Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 971-72 (9th Cir. 2003).

the No-Touch ordinance provision." The allegations described payments made to Inzunza to which he knew he was not entitled, accompanied by an express promise to perform official acts. The government thereby alleged a *quid pro quo*. *See McCormick*, 500 U.S. at 273; *Kincaid-Chauncey*, 556 F.3d at 943.

### D.    Failure to Give a Good Faith Instruction

Inzunza contends that the district court's failure to give a requested good faith instruction was error under *Mathews v. United States*, 485 U.S. 58, 63 (1988). We agree with the district court that no good faith instruction was warranted. *Frega*, a case involving charges of honest services fraud, reaffirmed the principle that "the failure to give an instruction on [a] 'good faith' defense is not fatal so long as the court clearly instructed the jury as to the necessity of 'specific intent' as an element of a crime." 179 F.3d at 804 (quoting *United States v. Sarno*, 73 F.3d 1470, 1487 (9th Cir. 1995)). *Frega* clearly establishes that a good faith instruction is not always required in honest services fraud cases.

**[15]** The district court extended *Frega* to the Hobbs Act context as well, reasoning that the *quid pro quo* extortion instruction satisfies the standard set out in *McCormick*, 500 U.S. at 273-74. Because a knowing *quid pro quo* is the nub of both the Hobbs Act extortion and honest services fraud charges in this case, *Frega* naturally applies in both contexts. This conclusion is not undermined by Justice Kennedy's statement, made in a controlling concurrence, that "a public official who labors under the good-faith but erroneous belief that he is entitled to payment for an official act does not violate [the Hobbs Act]." *Evans v. United States*, 504 U.S. 255, 277 (1992) (Kennedy, J., concurring). While this statement may further define the mens rea required for a Hobbs Act conviction, it does not countermand the principle that adequate instructions on specific intent eliminate the need for an additional defense instruction on good faith.

The jury instructions were sufficient in this case. As Justice Kennedy explains, a defendant is guilty only if he "know[s] that he is not entitled to the payment." *Id.* Here, the court instructed the jury that a violation of the Hobbs Act could be found only if "Inzunza obtained money for the benefit of defendant Zucchet which he knew neither he nor defendant Zucchet was entitled to." It was not error to instruct the jury that circumstantial evidence could support such a finding.

## E.    Testimony About the $10,000 Cash Payment

Inzunza argues that the district court erred when it denied him a new trial despite the government's use of Galardi, an allegedly perjured witness. Factual determinations underlying the perjury ruling are reviewed for clear error; legal determinations are reviewed de novo. *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002).

A prosecutor may not knowingly introduce false testimony, and he has an obligation "to act when put on notice of the real possibility of false testimony." *N. Mariana Islands v. Bowie*, 243 F.3d 1109, 1118 (9th Cir. 2001); *see also Morris v. Ylst*, 447 F.3d 735, 744 (9th Cir. 2006). If the government is found to have presented false evidence, "a defendant is entitled to a new trial if there is a reasonable probability that without the evidence the result of the proceeding would have been different." *United States v. Young*, 17 F.3d 1201, 1204 (9th Cir. 1994) (internal quotation marks, alterations, and citation omitted).

**[16]** We conclude that no *Bowie* error took place here. The facts of this case fall far short of the egregious facts of *Bowie*, where the government had express notice that perjury was afoot, and *Morris*, where a status report prepared in the State Attorney General's Office stated that a prosecution witness had perjured herself. While Galardi's memory failure and pro-prosecution bias gave rise to credibility problems, the prosecution did seek out and find evidence to corroborate the testi-

mony. The jury did not convict Inzunza of any wire fraud or Hobbs Act offense occurring after March 2003, so it is not reasonably probable that testimony about events occurring after this date prejudiced the trial. Thus, Inzunza's *Bowie* challenge fails.

**F.** *Brady*      **Disclosure of O'Melveny Memos and D'Intino's Statements**

[17] We also reject Inzunza's contention that a new trial is warranted because the prosecution failed to disclose exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). We review such allegations de novo. *United States v. Antonakeas*, 255 F.3d 714, 725 (9th Cir. 2001). We do not "automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict . . . A finding of materiality of the evidence is required . . . ." *Barker v. Fleming*, 423 F.3d 1085, 1096 (9th Cir. 2005) (quoting *United States v. Bagley*, 473 U.S. 667, 677 (1985)) (alterations in original).

The evidence in question—Galardi's characterization of payments as campaign contributions, inconsistencies concerning business cards found at his club, and evidence of tax evasion—simply duplicated evidence presented. Its possible impact was so small that we cannot regard the evidence as material. This is not a case like *Carriger v. Stewart*, 132 F.3d 463, 480-81 (9th Cir. 1997) (*en banc*), where cumulative evidence was important to the jury's determination of credibility of a crucial witness. Here, the additional evidence could not have affected the result of the trial. *See Barker*, 423 F.3d at 1096-98 (duplicate grounds for impeachment are not material under *Brady*). Therefore, the failure to disclose this evidence was not a *Brady* violation.

Inzunza also argues that *Brady* required disclosure of statements by a non-testifying potential witness and co-defendant,

D'Intino, who also characterized payments to the councilmen as "campaign contributions." As a matter of law, such statements are not exculpatory, *see United States v. Montoya*, 945 F.2d 1068, 1074 n.2 (9th Cir. 1991), *abrogated on other grounds by McCormick*, 500 U.S. 257, and therefore they are not material under *Brady*.

There is no merit to Inzunza's claim that the government made an impermissible "side deal" with D'Intino, which, if known to the jury, might have cast doubt on the government's credibility. Inzunza cites no authority for his argument that evidence of negotiations with non-testifying co-defendants, without more, is exculpatory. *Brady* is simply not implicated.

## G.  Commenting on the Failure to Testify

Inzunza complains that the government improperly commented on his failure to testify during closing arguments. Toward the end of its rebuttal, the prosecution referred to the 1919 Chicago White Sox scandal, quoting a disappointed fan's lament to the corrupt player Shoeless Joe Jackson: "Say it isn't so, Joe. Say it isn't so. Say it isn't so."[5] While the parties quibble about the prosecutor's exact movements, the judge indicated that the prosecutor closed roughly half the distance between himself and the defendants, looked and stretched out his hand in the general direction of the defendants while he spoke. He continued, "But it is. Plan here was to deceive the public, to deceive their fans, deceive their families." The district court denied Inzunza's motion for a new trial on this ground.

In *Griffen v. California*, the Supreme Court held that the Fifth Amendment forbids the prosecution to comment on a criminal defendant's failure to testify. 380 U.S. 609, 615 (1965). *Griffen* claims are reviewed de novo. *See, e.g., United*

---

[5]We prefer the usual statement of the legend, which has a young boy saying "Say it ain't so, Joe."

*States v. Smith*, 282 F.3d 758, 769 (9th Cir. 2002). We conclude that the prosecution in this case did comment on Inzunza's failure to testify, but the comment does not warrant reversal because the error was harmless.

A prosecutor's statement is improper "if it is manifestly intended to call attention to the defendant's failure to testify, or is of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify." *Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987). Such comments, however, are subject to harmless error analysis:

> Prosecutorial comment mandates reversal where such comment is extensive, where an inference of guilt from silence is stressed to the jury as a basis of conviction, and where there is evidence that could have supported acquittal. Nevertheless, where the prosecutorial comment was a single isolated statement, where it did not stress any reference to guilt, and where it was followed by curative instructions, we have been reluctant to reverse.

*United States v. Kennedy*, 714 F.2d 968, 976 (9th Cir. 1983) (internal quotation marks and citation omitted).

**[18]** Contrary to the conclusions of the district judge, we hold that "Say it isn't so" is a comment on the failure to testify. The comment may be metaphorical and the demand rhetorical but, at base, the statement describes the confrontation of the accused and a demand for a statement. It calls to mind *Griffen*'s admonition that "comment on the refusal to testify is a remnant of the inquisitorial system of criminal justice." 380 U.S. at 614 (internal quotation marks and citation omitted). The fact that the inquisitor laments the failure to give an answer is beside the point.

The *Smith* court confronted similar rhetoric addressed to the defendant: "This isn't how it was supposed to end, is it

Mr. Smith? You're not supposed to be here in Seattle. You're supposed to be down in the Florida Keys on a big sailboat, enjoying all that money you were going to make by importing marijuana." 282 F.3d at 769. The court reserved the question whether that statement was an impermissible comment because it held that the comment was harmless. *Id.* at 769-70.

In this case, too, the district judge indicated that the comment was a single, isolated incident. It occurred toward the end of the prosecution's rebuttal, but it was not close to the last thing the jury heard; the argument continues for another twelve transcript pages. Inzunza points out no portions of argument where the prosecutor "stress[es] an inference of guilt from silence as the basis for conviction." *Id.* at 769. Like the comment in *Smith*, the White Sox story was a "lead-in" for a different line of argument: that Inzunza had brought shame to public office, and that numerous conversations between the defendants had been recorded. Finally, the district judge gave a pointed limiting instruction on the matter. Under these circumstances, we are "reluctant to reverse." *Kennedy*, 714 F.2d at 976.

**[19]** The language of *Kennedy* suggests that reversal may yet be mandatory where there is "evidence that could have supported acquittal." The district court stated that the evidence of a *quid pro quo* was "not overwhelming." However, this statement by itself does not show that the evidence supported acquittal. Taking away the improper argument in this case, *see United States v. Velarde-Gomez*, 269 F.3d 1023, 1034-35 (9th Cir. 2001) (*en banc*), the thrust of the prosecution's proof (and the nature of Inzunza's defense) changes very little. The primary evidence in the case was the recorded conversations and testimony of other witnesses showing Inzunza's course of dealing. For these reasons, the denial of a new trial under *Griffen* was not error.

## H.    Other Objections to Closing Argument

Inzunza contends that the government made several other improper closing arguments, some of which were objected to

at trial. We review de novo the district court's finding that closing argument did not constitute misconduct. *United States v. Perlaza*, 439 F.3d 1149, 1169 n.22 (9th Cir. 2006). We review for plain error, however, arguments not objected to in the district court. *United States v. Combs*, 379 F.3d 564, 568 (9th Cir. 2004). None of Inzunza's claims in this area has merit.

### 1. *Comment on the Failure to Call a Witness*

The prosecution's comment on Inzunza's failure to call Anthony Wagner as a witness was not improper because "it [was] not phrased to call attention to defendant's own failure to testify." *United States v. Castillo*, 866 F.2d 1071, 1083 (9th Cir. 1988) (citation and internal quotation marks omitted).

### 2. *Asking the Jury to Respond to a Societal Crisis*

Inzunza argues that a new trial is warranted because the government asked the jury to respond to a societal crisis, a practice condemned by *United States v. Weatherspoon*, 410 F.3d 1142, 1149 (9th Cir. 2005). We disagree. The comments in question were isolated, and comments about societal problems, while improper, were cured by general instructions to the jury to base its decision on the evidence presented. *See, e.g.*, *United States v. Williams,* 989 F.2d 1061, 1072 (9th Cir. 1993); *United States v. Polizzi*, 801 F.2d 1543, 1558 (9th Cir. 1986).

### 3. *Improper Vouching*

We likewise reject Inzunza's contention that the government improperly vouched for witnesses. "The government may not vouch for the credibility of its witnesses, either by putting its own prestige behind the witness, or by indicating that extrinsic information not presented in court supports the witness' testimony . . . ." *United States v. Simtob*, 901 F.2d 799, 805 (9th Cir. 1990). In its closing argument, the govern-

ment quoted the Department of Justice motto "The United States wins when justice is done." It referred to conversations with Galardi that were not in evidence and asserted that "we know" that $2,000 cash from Galardi was delivered to each of the defendants in March or April 2003. It referred to various statements by Galardi, made in and out of court. It also read Galardi's plea agreement to the jury during Galardi's testimony and admitted a redacted copy of the agreement into evidence. Inzunza argues that these tactics amounted to vouching.

A similar use of the Department of Justice motto was analyzed in *United States v. Eley*, 723 F.2d 1522 (11th Cir. 1984). The *Eley* court allowed for the possibility that this statement would imply to the jury that the U.S. Attorney has information confirming the guilt of the accused. *Id.* at 1526. The court held, however, that the quotation was permissible to rebut "remarks of defense counsel that charged that the investigating officers were callous in their attitude towards the case and that the government's prosecution of the case was abusive." *Id.* In the present case, the defense did argue to the jury that the prosecution was politically motivated. We find the reasoning of *Eley* applicable to this case and hold that the quotation was not improper under the circumstances.

[20] Inzunza also argues that the government vouched for Galardi by referring to interview notes that were not before the jury and by stating that "we know" cash from Galardi was delivered. We reject these arguments as well. "[P]rosecutors should not use 'we know' statements in closing argument." *United States v. Younger*, 398 F.3d 1179, 1191 (9th Cir. 2005). Nonetheless, the use of the phrase in the present case was not improper because it was employed "to marshal evidence actually admitted at trial and [to offer] reasonable inferences from that evidence, not to vouch for witness veracity or suggest that evidence not produced would support a witness's statements." *Id.* The prosecutors' statements thus did not constitute vouching.

**[21]** The references to interview notes not before the jury pertained to the government's obligation to disclose exculpatory material to the defense. Read in context, these references support an inference that the government kept nothing from the defense that was helpful to Inzunza. They do not support the additional inference that the government had undisclosed information corroborating Galardi's testimony. Therefore, these references were not improper.

Inzunza contends that the government should not have argued that Galardi's prior consistent statements bolstered his credibility because those statements were not admissible under Federal Rule of Evidence 801(d)(1)(B). This argument conflates the standard for admissibility with the rule against vouching. The prior consistent statement was admitted without objection, and the government was entitled to argue the inference.

**[22]** Finally, it was not improper for the government to read from and admit into evidence Galardi's plea agreement. The agreement was redacted before it was sent to the jury; thus, the district court avoided the error of putting "the full text, including the clause providing for [polygraph] examination at the Government's election . . . before the jury while it deliberated the truth of the witnesses' testimony." *United States v. Brown*, 720 F.2d 1059, 1074 (9th Cir. 1983). Other references to promises to testify truthfully in the plea agreement were "only mild forms of vouching," justified because "defense counsel did cross-examine [Galardi] about the terms of [his] plea agreement[ ] and [his] motivation for cooperating with the government." *United States v. Brooks*, 508 F.3d 1205, 1211 (9th Cir. 2007). Thus, these references did not amount to "plain error." *Id.*

## I.    Cumulative Error

**[23]** Even if no error individually supports reversal, the cumulative effect of numerous errors may support reversal.

*United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996). The trial in this case lasted several weeks and involved extensive closing argument. We have discussed nearly all of Inzunza's claims of error, and we find no merit in the remaining claims that we have not discussed. In light of the sheer scale of this case, we hold that the isolated errors exhaustively catalogued by Inzunza do not support reversal in the aggregate.

## Zucchet: The Government's Appeal

Zucchet also moved for a judgment of acquittal and a new trial. The district court granted the motion for a judgment of acquittal with respect to Counts 4, 19, 20, 23, 35, 36, and 37 (relating to the Hobbs Act and honest services fraud). The court denied the motion with respect to Counts 1 and 32 (relating to a conspiracy to commit honest services fraud and an April 2003 honest services fraud violation), but granted the motion for a new trial on these counts. The government appeals these rulings.

We review de novo the grant or denial of a motion for acquittal. *See United States v. Johnson*, 357 F.3d 980, 983 (9th Cir. 2004). We review for an abuse of discretion the district court's ruling on Zucchet's motion for a new trial. *See United States v. Mack*, 362 F.3d 597, 600 (9th Cir. 2004).

## A.    Rule 29 Motion for Acquittal

The district court granted the motion in this case because, taking the evidence in the light most favorable to the verdict, it found that the government failed to show any explicit agreement or official action on the part of Zucchet prior to April 2003. Inzunza solicited funds for Zucchet in January and February of 2002. As late as February 12, 2003, after the strategy session regarding the No-Touch ordinance that Zucchet attended on February 10, 2003, Malone still did not know whether Zucchet was on board with his plan. Similar doubts

were expressed on October 18, 2002, and Malone failed to name Zucchet in a list of people who were cooperating. On February 28, 2003, Malone made statements supporting the view that the bargain was struck between Inzunza and Malone, independent of Zucchet. Zucchet failed to cooperate in the plan to meet with a corrupted police officer to discuss the No-Touch ordinance, meeting with the officer's supervisor instead. Zucchet finally agreed to refer the No-Touch ordinance matter to the Committee in the course of a breakfast meeting on April 16, 2003, and a phone message left on April 25, 2003, while admitting reluctance to advocate the issue with any opposition from the police. He referred the matter to the Committee on April 30, 2003.

We agree with the district court that the above facts do not permit a finding of a *quid pro quo* beyond a reasonable doubt. There was neither an explicit promise nor a connection of such a promise to a contribution. The government relies heavily on Inzunza's dealings with Malone as circumstantial evidence of Zucchet's guilt, but there is simply nothing in the record to confirm Zucchet's participation in their bargain. Zucchet's referral of the matter to the Committee may have been the execution of an obligation to Malone, but it could just as easily have been an innocent political act. Similarly, we know nothing of what transpired at Zucchet's half-hour meeting with Malone at the 2001 fundraiser. Suspicion alone will not support criminal liability; on this record, a rational juror would entertain reasonable doubts that preclude a finding of guilt on the counts in question.

**[24]** Zucchet's cooperation at the strategy session on February 10, 2003 and his insistence on donations from "clean" sources do not alter the conclusion. Large gaps exist in the government's case against Zucchet. The evidence suggested a deal between Inzunza and Malone, but no such express understanding involving Zucchet. In fact, several pieces of evidence suggest that Zucchet was not "on board" or aware of Malone's bargained-for expectations of him. Zucchet's coop-

eration did not become clear until April 2003. We agree with the district court that no reasonable juror could have found that Zucchet aided or abetted any agreement with unambiguous *quid pro quo* (Counts 35, 36, 37) or agreed to a *quid pro quo* himself prior to that date (Counts 2, 19, 20, 23). We affirm the grant of Zucchet's motion for acquittal on these counts.

## B.    Rule 33 Motion for a New Trial

As to Counts 1 and 32, the district court denied the motion for acquittal but granted the motion for a new trial. In granting a new trial, the district court necessarily reasoned that the two campaign contributions solicited by Inzunza in early 2002 were too far removed in time to relate to Zucchet's ultimate agreement to refer the matter to the Committee at the end of April 2003. Therefore, Galardi's testimony about the $10,000 cash payment in 2003 was the linchpin of the government's case on these counts. The district court declined to let the verdict stand on Galardi's unreliable, surprise testimony regarding this payment, a late recollection uncorroborated by recordings where other payments were freely discussed. The district court's new trial order suggested that only the April 2003 cash payment could have supported a finding of a *quid pro quo*.

"A district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal . . . . Our role is limited to determining whether the district court clearly and manifestly abused its discretion." *United States v. Alston*, 974 F.2d 1206, 1211-12 (9th Cir. 1992) (internal quotation marks, citations, and alterations omitted).

We affirm the district court's grant of a new trial, although on slightly different grounds from those cited by the district court. The government contends on appeal that, as a matter of law, the $10,000 payment was not the linchpin of its case

because Zucchet could have been found guilty on the ground that he knowingly conspired with Inzunza and aided the *quid pro quo* between Inzunza and Malone, even if he did not make his own *quid pro quo* bargain. While it is true that the district court failed to express any view on these legal theories, the outcome remains the same in this case whether or not those theories are employed.

"To prove a conspiracy under 18 U.S.C. § 371, the government must establish: (1) an agreement to engage in criminal activity, (2) one or more overt acts taken to implement the agreement, and (3) the requisite intent to commit the substantive crime." *United States v. Sullivan*, 522 F.3d 967, 976 (9th Cir. 2008). Similarly, 18 U.S.C. § 2 prohibits aiding and abetting federal offenses, and the jury was instructed on this theory of liability. "Conviction as an aider and abettor requires proof the defendant willingly associated himself with the venture and participated therein as something he wished to bring about." *United States v. Zemek*, 634 F.2d 1159, 1174 (9th Cir. 1980).

[25] The district court could have concluded that a new trial was warranted on any conspiracy or abetting on Zucchet's part for the same reason that it was warranted on Zucchet's direct participation in the *quid pro quo*. Indeed, it would be difficult to separate the two: the purported payments made in the course of the conspiracy flowed to Zucchet. If he participated in the alleged *quid pro quo* transactions, he was a direct participant and not a casual bystander. To the extent that his lack of knowledge would preclude his culpability as a direct participant, it also would preclude his culpability as a conspirator or aider and abettor. Both avenues of liability were cast into doubt by the deficiency of evidence of any knowing connection on Zucchet's part between the earlier payments and his later official action. Thus the government's alternative theory to reliance on Galardi's questionable testimony to support the two charges is not persuasive. We accordingly affirm

the district court's grant of Zucchet's motion for a new trial on Counts 1 and 32.

## CONCLUSION

With respect to defendant Inzunza, the judgment of the district court is **AFFIRMED**. With respect to defendant Zucchet, the judgment of the district court is **AFFIRMED**. We stay the issuance of the mandate pending the decision of the Supreme Court in *United States v. Weyhrauch*, 548 F.3d 1237 (9th Cir. 2008), *cert. granted*, No. 08-1196, 2009 WL 789239 (U.S. June 29, 2009).

**Nos. 05-50902 and 05-50960 AFFIRMED; MANDATE STAYED.**