IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 77003-9-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| RONALD BROWNELL MARTIN, | ) | |
| | ) | |
| Appellant. | ) | FILED: January 14, 2019 |

SCHINDLER, J. — The trial court found Ronald Brownell Martin guilty of felony

harassment, misdemeanor stalking, and obstruction of a law enforcement officer in the

discharge of his duties. Martin appeals only the conviction for obstruction of law

enforcement officer Stephen Cloninger. Martin contends the State violated Brady v.

Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), by suppressing

favorable impeachment evidence and the court violated his right to confrontation by

limiting cross-examination. Because Martin cannot show prejudice or an abuse of

discretion, we affirm.

## FACTS

Dawn Jordan is a social worker at YWCA at Opportunity Place. Opportunity

Place provides services and housing to men and women.

During summer 2016, Ronald Brownell Martin was the guest of a resident at Opportunity Place. Other residents expressed "concerns" about Martin. In October, Jordan removed Martin from the "guest list." Jordan told him he was "not allowed in our lobby" and "not allowed up to the resident floors." Martin told Jordan that she "could not tell him what to do, that he didn't have to listen to us, [and that] we weren't in charge of him." Although Martin eventually left, he "kept coming back persistently."

Martin started following Jordan from the building. Jordan said Martin told her he "knew where I lived, he was going to kill my family," and "he would kill me." Martin "talked about robbing" and "beating" Jordan. Jordan made a "safety plan" and told a friend to "meet me at my work every day . . . and escort me home."

By November, Jordan had "daily interactions" with Martin. Martin told Jordan she would "get on his team eventually" and "he would make sure I got on his team."

In late November, Martin followed Jordan onto a bus. While on the bus, Martin made a "gun gesture" with two fingers pointed at Jordan and "pull[ed] it" like "a trigger." Jordan got off the bus early and "just kept walking."

Between October and December, Jordan called the police at least 12 times. Jordan told Martin "on multiple occasions" she was calling the police. Martin would react by "antagonizing her further." Each time Jordan called, Martin left before the police arrived. In December, Jordan obtained a no-contact order.

On December 29, Jordan saw Martin "talking to one of our residents" outside the building. The resident was "repeatedly trying to get away from" him. Opportunity Place desk receptionist Hannah Young told Martin he "needed to leave." Jordan told Martin he "needed to stay away from the building." In response, Martin told Jordan he "knows

people who know what to do with a bitch with a big mouth." Martin then stood "right outside of our windows at our front lobby, looking in, knocking."

Because of poor reception, Jordan had to walk outside to use her cell phone to call the police. Jordan told Martin, " 'You can't be here, you need to leave.' " Martin had a "weird, leering smile" and said he would "wait until I get off work and rip my panties off." Martin told Jordan, "Go ahead, call the cops, bitch," and said he "was going to kill me and that he was going to rob my fat ass."

When Martin "tried to enter the YWCA," Young told him he had "to leave the property." Martin became "verbally abusive" to Young. Martin told Young "to follow him down the street, he would show me something." Young "believed that he was going to physically harm me" and "grabbed my mace for protection."

Jordan called 911 again. While she was on the phone, Martin stood near Jordan, yelled at her, and walked in circles around her.

Seattle Police Officer Stephen Cloninger and Officer Kent Loux responded to the 911 call. When Young saw the police car arrive, she "immediately ran outside." Young saw Martin standing at the corner down the street. Young knocked on the patrol car window and "yelled at the officers 'you need to grab that guy,' while pointing down the road" toward Martin. At the same time, Martin started walking away.

Officer Cloninger asked Young "what was going on." Young said Martin "threatened to shoot her or someone else." Officer Cloninger and Officer Loux began walking toward Martin "in order to catch up with him." But when they turned the corner, Martin "was no longer in sight." After walking further down an alleyway, the officers saw Martin "about half a block away, or approximately 200 feet from them." Martin "turned"

3

and "looked at the officers." Officer Cloninger and Officer Loux were wearing police uniforms that "included numerous markings identifying them as law enforcement officers." As Martin "was making eye contact with the officers, Officer Cloninger yelled at him, 'Stop, Police.' " Officer Cloninger continued to yell, " 'Stop, Police' " multiple times. Martin "immediately turned and ran away." The officers pursued Martin on foot. The officers "called for assistance over radio" and Officer Cloninger described Martin as a black male in a "black down jacket." "[N]umerous additional officers arrived" to pursue Martin. Officer Cloninger and Officer Loux followed Martin to Westlake mall but lost sight of him.

Officer Tad Willoughby was "working in the bicycle unit." After hearing "the pursuit" was "coming my direction on foot," Officer Willoughby rode his bike a block south of Westlake to the monorail elevator "in case somebody comes out of that elevator." Officer Willoughby saw "a black male in a fuzzy collar, with a dark jacket, run across the street and run into the Bartel[l]'s." Officer Willoughby informed dispatch. Officer Willoughby saw the man initially go "to the back of the store and then eventually started walking towards the front of the store."

Officer Ryan Beecroft and Officer James Kellet entered Bartell Drugs with Officer Willoughby and arrested Martin.

The State charged Martin with felony harassment of Jordan on December 29, 2016 in violation of RCW 9A.46.020(1) and (2)(b), count 1; misdemeanor stalking of Jordan "between October 1, 2016 and December 29, 2016" in violation of RCW 9A.46.110, count 2; misdemeanor harassment of Young in violation of RCW 9A.46.020(1), count 3; and obstruction of law enforcement officer Stephen Cloninger on

December 29, 2016 in violation of RCW 9A.76.020(1), count 4. Martin pleaded not guilty. Martin waived his right to a jury trial.

Jordan, Young, Officer Cloninger, Officer Loux, and Officer Willoughby testified at trial. Jordan testified that "[a]t first," Martin's behavior "didn't bother me that much." Jordan said, "I'm sort of used to people not being happy when they are hearing somebody they don't like, so it wasn't unusual at first to be sort of yelled at and disrespected." However, after his behavior "escalate[d] into threats," Jordan believed Martin "would actually follow through on his threat to kill" her. Jordan testified:

> I was always scared waiting for the bus outside of my building, I would always be looking around for him. I was always watching over my shoulder. I was just terrified, he just terrified me, I had no idea what he was going to do and I honestly believed that he, at some point, was going to harm me.

Young testified that when the police arrived at Opportunity Place on December 29, Martin was standing "right on the corner." Young said that while she was talking to the police, Martin was "looking behind him" with "his back . . . maybe turned towards me."

On cross-examination, Young conceded that Martin "didn't approach" her "at all" and said he "was just kind of hollering" at her. Defense counsel asked Young if she told the police that Martin had "threatened to shoot you." Young answered, "I don't remember him saying he was going to shoot me." Young said she was "[p]retty sure" she told the police that Martin was "threatening to shoot another staff member."

Officer Cloninger testified that Martin "was walking quickly northbound on Third Avenue" and the officers "basically tracked his footsteps." Officer Cloninger testified that when Martin "turned" and "made eye contact with me," Martin was "[a]t most, a half

block" away. After Officer Cloninger yelled for Martin to stop, he "started running southbound." Officer Cloninger said, "Officer Loux is taller and faster than I am, so I — he took off, I was following behind him." Officer Cloninger said they "lost sight of [Martin] in the area of 5th and Olive."

The court found Martin guilty of felony harassment of Jordan, misdemeanor stalking of Jordan, and obstruction of Officer Cloninger in the discharge of his duties. The court found Martin not guilty of misdemeanor harassment of Young. The court entered extensive and detailed findings of fact and conclusions of law.

## ANALYSIS

### Obstruction of a Law Enforcement Officer

Martin appeals only the conviction for obstructing a law enforcement officer. Martin does not assign error to any of the findings of fact. We treat unchallenged findings as verities on appeal. State v. Kaiser, 161 Wn. App. 705, 724, 254 P.3d 850 (2011).

"A person is guilty of obstructing a law enforcement officer if the person willfully hinders, delays, or obstructs any law enforcement officer in the discharge of his or her official powers or duties." RCW 9A.76.020(1). The court found Martin guilty of obstruction of Officer Cloninger—"The defendant did willfully hinder, delay, and obstruct Stephen Cloninger, a law enforcement officer, in the discharge of his official powers and duties." The unchallenged findings of fact state, in pertinent part:

**Count 4—Obstructing a Law Enforcement Officer**

> 32) On December 29, 2016, Seattle Police Officers Stephen Cloninger and Kent Loux arrived in their patrol vehicle outside the YWCA approximately two hours after Ms. Jordan first called 911.

6

33) When the officers arrived, Ms. Young quickly ran outside and yelled at the officers "you need to grab that guy," while pointing down the road to the defendant.

   a. The defendant began walking away at the same time.

   b. Officer Cloninger asked Ms. Young for more detail of what was going on, and Ms. Young stated that the defendant had threatened to shoot her or someone else.

34) Both officers got out of their patrol vehicle and began to walk in the direction of the defendant in order to catch up with him.

35) The officers were exercising their official duties by attempting to contact the defendant to further investigate Ms. Young's statements of what he had done.

36) When the officers turned the corner the defendant had just passed, the defendant was no longer in sight.

37) Walking further down an alleyway, the officers saw the defendant about half a block away, or approximately 200 feet from them.

   a. The defendant turned a[nd] looked at the officers.

   b. Both officers were in their standard uniforms, which included numerous markings identifying them as law enforcement officers.

   c. As the defendant was making eye contact with the officers, Officer Cloninger yelled at him, "Stop, Police."

   d. Officer Cloninger yelled "Stop, Police," multiple times.

   e. The defendant immediately turned and ran away.

38) The officers pursued the defendant on foot.

39) The officers called for assistance over radio, and numerous additional officers arrived in the area to pursue the defendant.

40) The defendant was eventually located inside a drug store, where he was taken into custody.

7

Brady Disclosures

Martin seeks reversal of the obstruction of a police officer conviction, arguing the State violated Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), by not disclosing favorable impeachment evidence about pending Seattle Office of Police Accountability (OPA) investigations against Officer Loux and Officer Willoughby and by limiting cross-examination of Officer Willoughby about other pending OPA investigations.

Under Brady, a prosecutor has an affirmative duty to learn of and disclose any exculpatory or impeachment evidence known to the prosecution or police investigators that is material to guilt or punishment. See Strickler v. Greene, 527 U.S. 263, 280-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). To establish a Brady violation, a defendant must establish three necessary elements:

> (1) "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching," (2) "th[e] evidence must have been suppressed by the State, either willfully or inadvertently," and (3) the evidence must be material.

State v. Davila, 184 Wn.2d 55, 69, 357 P.3d 636 (2015)[1] (quoting Strickler, 527 U.S. at 281-82)).

In analyzing a Brady violation, the court must "consider not only its discrete elements but also its animating purpose." State v. Mullen, 171 Wn.2d 881, 895, 259 P.3d 158 (2011). The animating purpose of Brady is to preserve the fairness of criminal trials. Morris v. Ylst, 447 F.3d 735, 742 (9th Cir. 2006) (citing Brady, 373 U.S. at 87).

> The Brady rule is not meant to "displace the adversary system"; "the prosecutor is not required to deliver his entire file to defense counsel, but

---

[1] Alteration in original.

only to disclose <u>evidence</u> favorable to the accused, that, if suppressed, would deprive the defendant of a fair trial."

<u>Morris</u>, 447 F.3d at 742[2] (quoting <u>United States v. Bagley</u>, 473 U.S. 667, 675, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985)).  As a matter of law, the State must disclose impeachment evidence favorable to the accused.  <u>Mullen</u>, 171 Wn.2d at 894.  CrR 4.7(a)(3) states, in pertinent part, "[T]he prosecuting attorney shall disclose to defendant's counsel any material or information within the prosecuting attorney's knowledge which tends to negate defendant's guilt as to the defense charged."

Before trial, the prosecutor sent an e-mail to Martin's attorney "regarding pending investigations into Officer Loux and Officer Willoughby."  The e-mail describes the OPA investigation of Officer Loux, No. 2017-OPA-0153, as follows:

> "OPA is currently investigating allegations that the following Seattle Police Department officers knowingly provided or participated in an attempt to provide false information to a police supervisor when verbally screening a use of force with that supervisor."

The e-mail describes the OPA investigation of Officer Willoughby, No. 2017-OPA-0032, as follows:

> "OPA is currently investigating allegations that the following Seattle Police Department officers were racially biased when they removed the complainant from a business at the request of the business management. . . . These allegations were made by a single complainant arising out of the same incident."

The State filed a pretrial motion to prohibit impeachment of the officers about the pending OPA investigations of Officer Loux and Officer Willoughby.  Because the allegations "have not been substantiated in any meaningful degree" and there had been no final determination, the State argued, "[I]nquiry into these matters . . . would be

---

[2] Emphasis in original.

highly speculative" and "[e]xamination under those circumstances would present significant danger of unfair prejudice and confusion of the issues."

Defense counsel told the court, "All of the information I have about [the] investigation[s] came from the State's Brady disclosure. As far as I know, these investigations are on-going, they are listed in the Brady disclosure as currently investigating. . . . That is everything I have seen." The attorney argued the pending OPA investigation of Officer Loux about whether "he had made a false statement to a supervisor" is relevant to his credibility. Defense counsel argued the pending OPA investigation of Officer Willoughby about whether he was "racially biased when he removed a complainant from a business at the request of the businessman" is "very similar to what we have in this case . . . , it is a white alleged victim and a black defendant." Defense counsel said he did not believe he could obtain any additional information from OPA:

> It didn't come up in this case, but I have previously — or I have, in other cases, attempted to subpoena OPA investigations, and they have refused to provide them when they are on-going. So I don't think there is going to be any additional information about this.

The court allowed cross-examination of Officer Willoughby about the OPA investigation of racial bias. The court found racial bias "is relevant and that would be admissible" and ruled defense counsel has "broad latitude to explore bias." But the court ruled that under ER 608(b), the defense could not impeach Officer Loux with the pending OPA investigation because the defense could not show a "good-faith belief that he did, in fact, falsify information when he made the report."

Martin contends the State violated Brady by failing to provide sufficient information about the pending OPA investigation of Officer Loux alleging he gave a false statement and the OPA investigation of Officer Willoughby alleging racial bias.

Where "a defendant has enough information to be able to ascertain the supposed Brady material on his own, there is no suppression by the government." United States v. Aichele, 941 F.2d 761, 764 (9th Cir.1991). There is no Brady violation where a defendant "possessed the 'salient facts regarding the existence of the [evidence] that he claims [was] withheld.' " Mullen, 171 Wn.2d at 902[3] (quoting Raley v. Ylst, 470 F.3d 792, 804 (9th Cir. 2006)). Due process does not "require the prosecution to conduct an independent investigation in the hopes of bolstering potentially exculpatory defense theories." Mullen, 171 Wn.2d at 902. Further, "[e]vidence that could have been discovered but for lack of due diligence is not a Brady violation." State v. Lord, 161 Wn.2d 276, 293, 165 P.3d 1251 (2007).

Before trial, the State provided the defense with information about the pending OPA investigations that included the OPA investigation numbers and a summary of the allegations against Officer Loux and Officer Willoughby. There is no dispute that following the disclosure, defense counsel did not take steps to obtain any additional information from OPA about the investigations.[4] Because the State provided

---

[3] Alterations in original.

[4] The court declined to continue trial to investigate the truth of the allegations:
Now, the issue is whether the Court should allow basically further investigation in to [sic] the truth of the allegation, that — or the Office of P[olice] Accountability is inquiring into. . . . I don't think that, at this juncture, the Court should delay the trial so that defense can do additional discovery into the truth of the basis of the OPA investigation. That's what the Court would be doing. And I'm going to exercise my discretion and decline to do that.

information about the salient facts related to the pending OPA investigations, the State did not violate Brady.

Martin also contends the State violated Brady by failing to disclose other pending OPA investigations against Officer Willoughby.

On cross-examination, defense counsel asked Officer Willoughby about the OPA investigation. Officer Willoughby testified, in pertinent part:

A. I have several pending complaints against me, yes.
Q. Okay. And are those being investigated?
A. They are all being investigated through OPA, yes.
Q. What are those — what are those investigations for?
    [PROSECUTOR]: Objection, your Honor, as to particular investigations. There is, for pre-trial, one investigation that defense can examine on.
    THE COURT: Sustained.
    [DEFENSE COUNSEL]: Your Honor, if there are other investigations that the State isn't telling me about —
    THE COURT: Okay. Then we have to have —
    [PROSECUTOR]: That's quite an allegation for counsel to make.
    THE COURT: I have made a ruling as to one investigation on a matter.
    [DEFENSE COUNSEL]: Okay.
Q. What is the allegation, for racial bias?
A. It is categorized for racial bias, yes.

Officer Willoughby said the other investigation was related to "asking a female to leave the Target store." Officer Willoughby said he wore a body camera and he faced "no possible sanctions for" the allegation.

The State has a duty to "seek out exculpatory and impeaching evidence held by other government actors." Davila, 184 Wn.2d at 71 (citing Kyles v. Whitley, 514 U.S. 419, 438, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995)). "Thus, the prosecution 'suppresses' evidence, for purposes of Brady, even if that evidence is held by others acting on the government's behalf, e.g., police investigators." Davila, 184 Wn.2d at 71.

But the prosecution is under no obligation to turn over materials not under its control.[5] Mullen, 171 Wn.2d at 895 (citing Aichele, 941 F.2d at 764); see also CrR 4.7(a)(3).

Because Officer Willoughby testified he had "several pending complaints," we assume for purposes of the Brady analysis that the State had a duty to disclose that impeachment evidence.

Martin asserts evidence of pending OPA investigations against Officer Willoughby was material because the conviction for obstructing a law enforcement officer "hinged almost exclusively on officer testimony and credibility." The record does not support his assertion. Evidence is material and therefore must be disclosed only if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different. Davila, 184 Wn.2d at 73. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. Bagley, 473 U.S. at 682. The effect of any omission must be evaluated cumulatively and in the context of the whole trial record. Davila, 184 Wash. 2d at 78. It is the defendant's burden to demonstrate that he was prejudiced by the prosecutor's failure to disclose exculpatory or impeachment evidence. State v. Luvene, 127 Wn.2d 690, 705-06, 903 P.2d 960 (1995).

The record shows the court did not rely on Officer Willoughby's testimony in finding Martin guilty of obstructing a law enforcement officer. The court relied on the testimony of Young, Officer Cloninger, and Officer Loux to find Martin guilty of obstruction of a law enforcement officer in the discharge of his duties. Martin cannot

---

[5] The role of OPA and whether it is a governmental agency is not clear on this record.

show a reasonable probability that had evidence of other pending OPA investigations of Officer Willoughby been disclosed before trial, the result would have been different.

Cross-Examination

Martin contends the court violated his right to confrontation by limiting cross-examination of Officer Loux under ER 608(b).

The Sixth Amendment guarantees an accused the right to confront the witnesses against him. U.S. CONST. amend. VI; Crawford v. Washington, 541 U.S. 36, 42, 51, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). The main and essential purpose of confrontation is the opportunity of cross-examination. State v. Lee, 188 Wn.2d 473, 487, 396 P.3d 316 (2017). But the right to confrontation is not absolute. Lee, 188 Wn.2d at 487. "Courts may, within their sound discretion, deny cross-examination if the evidence sought is vague, argumentative, or speculative." State v. Darden, 145 Wn.2d 612, 620-21, 41 P.3d 1189 (2002).

Courts apply a three-part test to determine whether a court violated a defendant's right to confrontation by limiting the scope of cross-examination:

> "First, the evidence must be of at least minimal relevance. Second, if relevant, the burden is on the State to show the evidence is so prejudicial as to disrupt the fairness of the fact-finding process at trial. Finally, the State's interest to exclude prejudicial evidence must be balanced against the defendant's need for the information sought, and only if the State's interest outweighs the defendant's need can otherwise relevant information be withheld."

Lee, 188 Wn.2d at 488 (quoting Darden, 145 Wn.2d at 622).

"The confrontation right and associated cross-examination are limited by general considerations of relevance." Darden, 145 Wn.2d at 621. Generally, evidence is relevant to attack a witness' credibility or to show bias or prejudice. Lee, 188 Wn.2d at

488. Evidence of specific instances of lying may be relevant to credibility but " 'their admission is highly discretionary under ER 608(b).' " Lee, 188 Wn.2d at 488 (quoting State v. Kunze, 97 Wn. App. 832, 859, 988 P.2d 977 (1999)). The proponent of ER 608(b) evidence must have a good faith basis that the misconduct actually occurred. See State v. Russell, 125 Wn.2d 24, 84, 882 P.2d 747 (1994) (error for prosecutor to ask witness whether he killed a cat and dangled it over a bridge where prosecution had no valid basis or reason to believe "this had happened"); State v. Johnson, 90 Wn. App. 54, 71, 950 P.2d 981 (1998) ("The cross-examiner must have a good faith basis for the inquiry.").

We review the trial court's decision to limit the scope of cross-examination under ER 608(b) for abuse of discretion. Lee, 188 Wn.2d at 486. A trial court abuses its discretion when its decision is " 'manifestly unreasonable or based upon untenable grounds or reasons.' " State v. Garcia, 179 Wn.2d 828, 844, 318 P.3d 266 (2014)[6] (quoting State v. Lamb, 175 Wn.2d 121, 127, 285 P.3d 27 (2012)).

The defense sought to admit evidence that Officer Loux made a false statement to a supervisor. Martin argued the pending OPA investigation about whether Officer Loux "had made a false statement to a supervisor" is "germane to his credibility as a witness." Defense counsel argued the "foundation for my belief" that the underlying misconduct occurred is that the State is "providing information to me as they believe they are required to do under Brady." The prosecutor argued the information the State provided "are purely allegations" and "[t]here has been no finding by any investigative

---

[6] Internal quotation marks omitted.

body that it . . . happened." The State argued defense counsel "cannot make any kind of a showing that a lie, or any kind of a false statement, in fact, took place."

Martin contends the court abused its discretion by limiting cross-examination of Officer Loux without weighing the probative value of the evidence. The record does not support his argument. The court found that the evidence of a pending investigation that Officer Loux made a false statement is "clearly relevant under ER-608(b)," but "the question is the prejudice." The court ruled that under ER 608(b), defense counsel could ask about an "incident involving dishonesty or veracity" on cross-examination only if "counsel has a good-faith belie[f] in basically the truth of the allegation." The court found that although there is a good-faith belief "that there is an investigation going on about Officer Loux's truthfulness in a particular incident," defense counsel did not demonstrate a "good-faith belief that he did, in fact, falsify information when he made the report." We conclude the court did not abuse its discretion in ruling under ER 608(b) the defense could not cross-examine Officer Loux about the pending OPA investigation.

In any event, exclusion of the impeachment evidence was harmless. Confrontation clause violations are subject to a harmless error analysis. State v. Beadle, 173 Wn.2d 97, 119, 265 P.3d 863 (2011). A constitutional error is harmless if " 'the untainted evidence is so overwhelming that it necessarily leads to a finding of the defendant's guilt.' " Beadle, 173 Wn.2d at 119 (quoting State v. Koslowski, 166 Wn.2d 409, 431, 209 P.3d 479 (2009)). Here, the unchallenged findings establish the untainted evidence establishes Martin is guilty of willfully obstructing Officer Cloninger in the discharge of his duty as a law enforcement officer.

We affirm the conviction of obstruction of a law enforcement officer.

WE CONCUR:

_Schindler, J_

_Andrus, J._

_Dwyer, J._